**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| MSP RECOVERY CLAIMS, SERIES LLC and MSPA CLAIMS 1, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> ABBOTT LABORATORIES, *et al.*, <br><br> Defendants. | Civil Action No. 19-21607 (MAS) (JBD) <br><br> **MEMORANDUM OPINION** |

**SHIPP, District Judge**

This matter comes before the Court upon Defendants Abbott Laboratories ("Abbott Labs"), Abbott Diabetes Care, Inc. ("Abbott Diabetes"), Abbott Diabetes Care Sales Corporation ("Abbott Diabetes Sales"), LifeScan, Inc. ("LifeScan"), Johnson & Johnson, and Roche Diabetes Care, Inc.'s ("Roche") (collectively, "Defendants") Motion to Dismiss Plaintiffs MSP Recovery Claims, Series LLC ("MSPRC") and MSPA Claims 1, LLC's ("MSPA") (collectively, "Plaintiffs") Amended Complaint (ECF No. 173). Plaintiffs opposed the Motion (ECF No. 181) and Defendants replied (ECF No. 185). The Court has considered the parties' written submissions and decides the Motion without oral argument, pursuant to Local Civil Rule 78.1.

For the reasons set forth below, Defendants' Motion to Dismiss is granted in part and denied in part.

## I.   BACKGROUND

### A.   The Parties[1]

Plaintiffs are the assignees of third-party payers ("TPPs") that pay for or reimburse Medicare enrollees for, among other medical services and products, single-use blood glucose test strips ("Test Strips"). (Am. Compl. ¶ 4, ECF No. 173.) Plaintiffs' assignors include numerous Medicare Advantage plans, health maintenance organizations, management service organizations, and other health insurers (collectively, "Plaintiffs' Assignors").[2] (*Id.* ¶ 28.) Plaintiff MSPRC is a Delaware limited liability company, and Plaintiff MSPA is a Florida limited liability company. (*Id.* ¶¶ 26-27.) Each maintains a principal place of business in Coral Gables, Florida. (*Id.*)

Defendant Abbott Labs, an Illinois corporation with its principal place of business in Abbott Park, Illinois, manufactures and markets the FreeStyle brand of Test Strips, including the Lite, InsuLinx, and Precision Neo varieties. (*Id.* ¶ 29.) Defendant Abbott Diabetes, a Delaware corporation located in Abbott Park, Illinois, is the wholly owned subsidiary of Abbott Labs. (*Id.*)

---

[1] Bayer Healthcare LLC ("Bayer Healthcare") and Ascensia Diabetes Care US, Inc. ("Ascensia") were originally included as Defendants in this matter. (*See generally* Compl.; Am. Compl.) Defendant Bayer Healthcare, a Delaware limited liability company with its principal place of business in Pittsburgh, Pennsylvania, produced Test Strips under the names Contour, Contour Next, and Breeze2 until 2016 when it was acquired by Panasonic Healthcare Holdings. (*Id.* ¶ 32.) Defendant Ascensia, a Delaware corporation with its principal place of business in Parsippany, New Jersey, was established through the 2016 acquisition and continues to produce the Contour, Contour Next, and Breeze2 Test Strips. (*Id.* ¶ 33.) On December 10, 2023, Plaintiffs notified the Court that Plaintiffs reached a settlement with Bayer Healthcare and Ascensia. (Settlement Notice, ECF No. 196.) All claims Plaintiffs raised against Bayer Healthcare and Ascensia were voluntarily dismissed with prejudice, with each party to bear its own attorneys' fees and costs. (*Id.*)

[2] Plaintiffs' Assignors include: Avmed, Inc. ("Avmed"), Blue Cross & Blue Shield of Rhode Island, ConnectiCare, Inc., EmblemHealth Services Company, LLC, Health Alliance Medical Plans, Inc. ("HEAL"), Health Care Advisor Services, Inc., Health First Health Plans, Inc. ("HFHP"), Healthcare Alliance Group, Inc., Network Health, Inc., Physician Access Urgent Care Group, LLC, Premier Care Partners, LLC, Risk Watchers, Inc., Transatlantic Healthcare, LLC, and Trinity Physicians, LLC. (*Id.* ¶ 28 n.11.)

Defendant Abbott Diabetes Sales, similarly a Delaware corporation located in Abbott Park, Illinois, is the wholly owned subsidiary of Abbott Diabetes. (*Id.* ¶ 30.) Defendant Abbott Diabetes develops and sells blood glucose monitoring systems, including Test Strips, whereas Defendant Abbott Diabetes Sales markets and sells blood glucose monitoring systems, including Test Strips. (*Id.* ¶¶ 29-30.) Defendants Abbott Labs, Abbott Diabetes, and Abbott Diabetes Sales are collectively referred to as "Abbott." (*Id.* ¶ 31. )

Defendant Johnson & Johnson, a New Jersey corporation with its principal place of business in New Brunswick, New Jersey, manufactures and markets healthcare products such as the OneTouch brand of blood glucose Test Strips, including the Ultra and Verio varieties. (*Id.* ¶ 35.) Defendant LifeScan, a California corporation with its principal place of business in Malvern, Pennsylvania, is a wholly owned subsidiary of Johnson & Johnson that develops and sells blood glucose monitoring systems, including Test Strips. (*Id.* ¶ 36.) Defendants Johnson & Johnson and LifeScan are collectively referred to as "J&J." (*Id.* ¶ 37.)

Defendant Roche, an Indiana corporation with its principal place of business in Indianapolis, Indiana, manufactures the Accu-Check brand of Test Strips, including the Guide, Aviva, Aviva Plus, Compact, SmartView, Performa, and Active varieties. (*Id.* ¶ 38.)

In addition, although not named as defendants, Plaintiffs allege that Pharmacy Benefit Managers ("PBMs"), such as CVS Health Corporation and its subsidiaries Caremark Rx, LLC and Caremark Rx, Inc. (collectively "CVS Health"), and Express Scripts, Inc. and its corporate parent Express Scripts Holding Company ("Express Scripts"), act as Defendants' "co-conspirators" by participating in Defendants' scheme to defraud Plaintiffs' Assignors into paying unlawfully inflated prices for Test Strips. (*Id.* ¶ 39.) CVS Health and Express Scripts are collectively referred to as the "PBM Co-Conspirators." (*Id.*)

**B.      The Test Strip Pricing Scheme[3]**

Defendants are entities that develop, manufacture, market, and sell blood glucose testing equipment used by millions of diabetes patients. (*Id.* ¶ 3.) In this action, Plaintiffs allege that Defendants have created a system to intentionally obscure the true price of Test Strips to defraud small market health insurers that cover such costs for their beneficiaries. (*Id.* ¶¶ 7-9.) According to Plaintiffs, Defendants publish falsely inflated prices for Test Strips while concealing the lower net selling prices offered to the largest PBMs, resulting in additional revenue for Defendants. (*Id.* ¶¶ 14-18, 22.) Plaintiffs contend that this collusive arrangement has caused TPPs, including Plaintiffs' Assignors, to overpay for Test Strips on behalf of their enrollees across the country. (*Id.* ¶ 24.) Plaintiffs further allege that this collusive arrangement has increased out-of-pocket costs for their enrollees and the general public. (*Id.*)

PBMs serve as intermediaries between manufacturers, health insurers, and their enrollees. (*Id.* ¶ 63.) Pharmaceutical products such as Test Strips are first distributed from manufacturers to wholesale distributors, and then further distributed from wholesale distributors to retail or mail-order pharmacies. (*Id.* ¶ 64.) Manufacturers, like Defendants, set what is called the

---

[3] This Court previously analyzed the facts giving rise to this action when it addressed Defendants' first Motion to Dismiss. *See MSP Recovery Claims, Series LLC v. Abbott Labs.*, No. 19-21607, 2021 WL 2177548 (D.N.J. May 28, 2021). Thus, the facts are well known to the parties. In the interest of efficiency, the Court will present an abbreviated version of Plaintiffs' allegations that incorporates the material changes that appear in the Amended Complaint.

"Wholesale Acquisition Cost" ("WAC") for their products.[4] (*Id.* ¶ 104.) Pharmaceutical manufacturers, including Defendants, report the WACs for each of their products to several pharmaceutical compendia that periodically publish the information.[5] (*Id.* ¶¶ 106, 110.) The published prices for Test Strips are used for contract negotiations and as a basis for reimbursement by TPPs, including Plaintiffs' Assignors. (*Id.* ¶ 109.) Plaintiffs refer to WAC and "Average Wholesale Price" (or "AWP") collectively as "list price" or "Reference Price."[6] (*Id.* ¶ 42; Pls.' Opp'n Br. 1 n.2.)

PBMs generate revenue in three primary ways: (1) TPP clients pay service fees for processing prescriptions; (2) TPPs pay transaction fees on operations required to manage the complex cash flows between insurers, pharmacists, and manufacturers; and (3) pharmaceutical manufacturers, such as Defendants, pay rebates and other fees. (Am. Compl. ¶ 65.) Plaintiffs allege that "PBMs have the greatest leverage to negotiate lower prices when two or more manufacturers

---

[4] The term "wholesale acquisition cost" is defined by statute as:

> [T]he manufacturer's list price for the drug or biological to wholesalers or direct purchasers in the United States, not including prompt pay or discounts, rebates or reductions in price, for the most recent month for which the information is available, as reported in wholesale price guides or other publications of drug or biological pricing data.

42 U.S.C. § 1395w-3a(c)(6)(B).

[5] "There are several pharmaceutical industry compendia that periodically publish, in printed and electronic media, the WACs for the products on the market, including First Data Bank and Medi-Span" (collectively "Publishers"). (Am. Compl. ¶ 110.)

[6] In the Amended Complaint, Plaintiffs state that "WAC and AWP are interchangeable concepts." (Am. Compl. ¶ 104 n.17.) While the two prices are closely related, WAC and AWP are distinct pricing terms. *See MSP Recovery*, 2021 WL 2177548, at *3. Both AWP and WAC are set by Defendants at the National Drug Code level "with the AWP being a formulaic 20-25% increase above WAC." (Pls.' Opp'n Br. 1 n.2.) Plaintiffs state that Defendants advertise the set list prices in "several compendia and those compendia for prices are referenced specifically in Assignors contracts for Test Strips." (*Id.*)

make ostensibly interchangeable products." (*Id.* ¶ 66.) As such, PBMs enter contractual relationships with manufacturers, retail pharmacies, and wholesalers to negotiate rebates, fees, and other concessions. (*Id.* ¶ 68.) Through these relationships, PBMs exert influence and control over which pharmaceutical products are made available to health plans, as well as the pricing tiers for such products. (*Id.* ¶ 69.) Plaintiffs allege that the undisclosed details of PBMs' relationships with pharmaceutical manufacturers—including contractual rebates affecting the net selling price of pharmaceuticals—allow Defendants to collude with PBMs in unlawful schemes to steer patients to more expensive products. (*Id.* ¶¶ 72-73.)

As part of the contractual relationship between PBMs and TPPs, PBMs are tasked with developing formularies (lists of pharmaceutical products covered by health plans at various pricing tiers) and negotiating with pharmaceutical manufacturers. (*Id.* ¶ 74.) To determine if a pharmaceutical product should be placed in a formulary, and if so, in which pricing tier, Plaintiffs allege that PBMs should assess the clinical safety, efficacy, and cost effectiveness of the product. (*Id.* ¶ 75.) Plaintiffs' Assignors contract with and pay PBMs to administer their Test Strip programs, and thus rely on PBMs to make impartial formulary decisions. (*Id.* ¶¶ 74, 76.) According to Plaintiffs, "[i]nclusion in formularies and obtaining favorable placement of a product within a formulary (*i.e.*, tier-1 placement), drives demand for that product within the PBM's entire network of physicians, pharmacists, and participating plans."[7] (*Id.* ¶ 80.) For this reason, formulary inclusion is vital to Defendants' business as pharmaceutical manufacturers because it results in

---

[7] Plaintiffs explain that placement in formularies "corresponds with the amount that a plan participant must contribute as a copayment when purchasing a product—the higher the placement, the lower the copayment, and the higher likelihood that the product will be purchased by plan enrollees in lieu of a more expensive alternative, and vice versa." (Am. Compl. ¶ 78.) Higher formulary placement, therefore, increases the likelihood that a physician will prescribe the product. (*Id.*)

increased product sales. (*Id.* ¶ 81.) Further, under this system, the extent to which the cost of a beneficiary's Test Strips will be paid by Plaintiffs' Assignors depends on how the PBMs structure their formularies. (*Id.* ¶ 82.)

i.        *Rebates and Allegedly Inflated Pricing*

These complex pharmaceutical industry relationships rely upon accurate and honest pricing of products. (*Id.* ¶ 83.) Plaintiffs, however, allege that Defendants and PBMs conspire to artificially raise the list prices for Test Strips, which "not only impacts TPPs who pay for [Test Strips] because they used a formulary, but . . . also impacts all TPPs that negotiate directly with wholesalers or the manufacturer's [sic] themselves because they are negotiating off of an artificially inflated price." (*Id.* ¶ 84.) In particular, Plaintiffs accuse Defendants of fraudulently inflating the published list prices of Test Strips—which typically serve as the basis for reimbursement under the relevant health plans—by failing to account for the rebate rates paid to PBMs for such products. (*Id.* ¶¶ 85-89.) As such, Plaintiffs' Assignors "were deceived into allowing the PBMs to include the [Test Strips] on their formularies and to place them favorably on their formularies, based on Defendants' and their PBM Co-Conspirators' misrepresentations." (*Id.* ¶ 88.)

More specifically, Plaintiffs allege that "Defendants and the PBMs discovered that they both benefit if, instead of forcing Defendants to compete on price, Defendants can raise their publicly reported list price, while maintaining nearly constant net prices, thus increasing the spread between the two prices and the resulting rebate to the respective PBM." (*Id.* ¶ 92.) This alleged conduct "allows the PBMs to leverage formulary control market share while also allowing Defendants to maintain or increase their profit margins by maintaining their sales volume through preferred formulary placement." (*Id.* ¶ 93.) Plaintiffs further allege that their assignors suffer from this collusive conduct because their assignors are forced to include the Test Strips on their formularies at a higher cost than they would otherwise. (*Id.* ¶ 94.) Plaintiffs also claim that

"Defendants knew they could directly control and fabricate the WAC for their products" by forwarding inflated WACs to the compendia publishers and that "Defendants also knew that actual rebate, administrative fee, and other discounting done by Defendants[—]the amounts paid to third party intermediaries[—]was not publicly available, and they kept this information highly confidential." (*Id.* ¶ 112.) Accordingly, Plaintiffs allege that "the WACs for the Test Strips at issue here bore little relationship to their net selling price in the marketplace," as "[t]hey were simply fabricated and overstated in furtherance of Defendants' scheme to generate the profit spread to PBMs and others at the expense of [Plaintiffs'] Assignors." (*Id.* ¶ 113.)

       ii.      *Defendants' Alleged Acknowledgment of the Scheme*

Plaintiffs point to public filings and statements made by Defendants regarding Test Strip pricing to allege that Defendants admitted to the purported scheme. (*Id.* ¶¶ 117-26.) According to Plaintiffs, although the list prices for Test Strips have climbed steadily for some time, the net prices of such products—which account for rebates—have not. (*Id.* ¶ 117.) Plaintiffs allege that J&J acknowledged the role that rebates play in the scheme during an earnings call when the company's Executive Vice President and Chief Financial Officer stated that "rebates continue to be an increasing part of the business and the overall realization of gross price to net price[;] that delta is expanding, I would say, over time." (*Id.*) Similarly, Plaintiffs allege that Abbott, in a separate pending lawsuit, admitted that the list price for Test Strips is inflated by undisclosed rebates. (*Id.* ¶ 119.) Plaintiffs highlight that Abbott's complaint in that lawsuit explains that rebates account for the price differential between Abbott's products sold in the United States and its products sold in other countries where they are substantially cheaper. (*Id.*) Plaintiffs also accuse Roche of recognizing the inflationary effect of rebates on the list prices of Test Strips. (*Id.* ¶¶ 120-23.) In another lawsuit, Roche sued several pharmacies and Test Strip distributors, claiming that they had fraudulently obtained rebates from Roche. (*Id.* ¶ 120.) In its complaint, Roche allegedly

acknowledged that the list prices of Test Strips were inflated to accommodate the rebates it offered to other customers. (*Id.* ¶ 123.)

### iii.    Impact of the Alleged Scheme

Plaintiffs emphasize that the alleged pricing scheme "allows Defendants to maintain or increase their profit margins on [Test Strips] sold in the United States by ensuring favorable formulary placement with TPPs, thus providing access to their [Test Strips] to millions of Americans." (*Id.* ¶ 125.) Plaintiffs explain that "[a]s list prices rise and net prices remain the same, rebates paid to the PBMs increase" such that the scheme is mutually profitable. (*Id.*) Ultimately, Plaintiffs' Assignors "shoulder the burden of the higher list prices through increased payment for their [e]nrollees' healthcare." (*Id.* ¶ 126.) Plaintiffs repeatedly analogize the alleged Test Strip pricing scheme to the soaring prices of insulin and the lack of transparency surrounding those prices, which recently garnered national attention and congressional intervention. (*Id.* ¶¶ 136-47.) According to Plaintiffs, "[r]egional payers such as [Plaintiffs' Assignors] have no idea what the actual cost of Test Strips should be," as they are offered "discounts without knowing that while one Assignor is being offered a 5% rebate, larger players in the system are being offered rebates quadruple that amount." (*Id.* ¶ 148.)

### C.    Procedural History

Plaintiffs initiated this action in 2019. (*See* Compl., ECF No. 1.) On May 28, 2021, the Court granted in part and denied in part Defendants' First Motion to Dismiss. (Op., ECF No. 73.) Specifically, the Court dismissed Plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO") with prejudice but allowed Plaintiffs' various state law claims to

proceed.[8] (*Id.*) Following a period of discovery, Plaintiffs filed their Amended Complaint on April 24, 2023, asserting similar claims of common law fraud, unjust enrichment, and causes of action under the consumer protection laws of twenty-two different states. (*See* Am. Compl. ¶¶ 166-517.) On May 30, 2023, Defendants jointly moved to dismiss the Amended Complaint. (Defs.' Moving Br., ECF No. 179-2.) Plaintiffs opposed the motion (Pls.' Opp'n Br., ECF No. 181), and Defendants replied (Defs.' Reply Br., ECF No. 185).

## II.   **LEGAL STANDARD**

Courts undertake a three-part analysis when considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must accept as true all of the plaintiff's well-pleaded factual allegations and "construe the

---

[8] Plaintiffs originally invoked the Court's federal question jurisdiction based on their RICO claims. (Compl. ¶ 29.) The Court, having dismissed the RICO claims, ordered the parties to show cause as to why the Court should not dismiss the action for lack of subject matter jurisdiction, indicating that the citizenship of all LLC members was not originally provided. (ECF No. 187.) The parties, accordingly, submitted responses. (*See* ECF Nos. 190, 191.) The Court finds that it still has subject-matter jurisdiction over this matter. *Kabakjian v. United States*, 267 F.3d 208, 212 (3d Cir. 2001) ("We have recognized as a general principle that jurisdiction is determined at the time the suit is filed."). That MSPRC's sole member was a Delaware limited liability company at the time of filing is not of concern. Although several Defendants are citizens of Delaware (*see* Defs.' Resp., ECF No. 190), "where an LLC has, as one of its members, another LLC, 'the citizenship of unincorporated associations must be traced through however many layers of partners or members there may be' to determine the citizenship of the LLC." *Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015) (quoting *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 420 (3d Cir. 2010)). Therefore, tracing through all the layers, MSPRC adopts the citizenship of its ultimate members—Texas and Florida. (*See* Pls.' Resp. 1-3, ECF No. 191); *see also Tarakciyan v. Supercenter-Secaucus*, No. 23-1179, 2023 WL 5807374, at *2 (D.N.J. Aug. 17, 2023), *report and recommendation adopted sub nom. Tarakciyan v. Walmart Supercenter-Secaucus*, No. 23-1179, 2023 WL 5806343 (D.N.J. Sept. 7, 2023) ("The only members of Wal-Mart Stores East, LP, are themselves limited liability companies (*i.e.*, unincorporated associations) and the sole member of those limited liability companies is another limited liability company. The [c]ourt must accordingly continue tracing the line of membership to the ultimate member[.]").

complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quotation omitted). In doing so, the court is free to ignore legal conclusions or factually unsupported accusations that merely state, "the-defendant-unlawfully-harmed-me." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "[M]ere restatements of the elements of [a] claim[ ] . . . are not entitled to the assumption of truth." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011) (alterations in original) (quotation omitted). Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). "The defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citation omitted).

"Independent of the standard applicable to Rule 12(b)(6) motions," Federal Rule Civil Procedure 9(b) "imposes a heightened pleading requirement of factual particularity with respect to allegations of fraud." *In re Rockefeller Ctr. Props. Secs. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002); *see also* FED. R. CIV. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). To satisfy this heightened pleading standard, a plaintiff must state the circumstances of his alleged cause of action with "sufficient particularity to place the defendant on notice of the 'precise misconduct with which [it is] charged.'" *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (alteration in original) (quoting *Lum v. Bank of Am.*, 361 F.3d 217, 223-24 (3d Cir. 2004)). Specifically, the plaintiff must plead or allege the "date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Id.* at 200 (citing *Lum*, 361 F.3d at 224). Indeed, the Third Circuit has advised that, at a minimum, Rule 9(b) requires a plaintiff to allege the "essential factual

background that would accompany 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where and how' of the events at issue." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276-77 (3d Cir. 2006) (quoting *In re Rockefeller*, 311 F.3d at 217).

## III.   DISCUSSION

Plaintiffs assert the following Counts: (1) State Consumer Protection Law violations; (2) New Jersey Common Law Fraud against Johnson & Johnson only;[9] (3) Indiana Common Law Fraud against Roche only; (4) Illinois Common Law Fraud against Abbott only; (5) Pennsylvania Common Law Fraud against LifeScan only; and (6) Unjust Enrichment. (Am. Compl. ¶¶ 166-517.) In their Motion to Dismiss, Defendants argue that Plaintiffs: (1) fail to plead a viable theory of liability for all claims; (2) lack standing to pursue the assignors' claims; and (3) fail to recognize that Plaintiffs' claims are unassignable under many state laws. (Defs.' Moving Br. 3-4, 14-60.) The Court considers each argument in turn.

### A.   Theory of Liability

The Court first addresses Defendants' argument that Plaintiffs fail to plead a viable theory of liability. (*Id.* at 3, 14-21.) Defendants argue that Plaintiffs' "Amended Complaint abandons the liability theory that allowed [Plaintiffs] to survive Defendants' first Motion to Dismiss and asserts a new theory that lacks any viable legal basis." (*Id.* at 14.) Specifically, Defendants assert that Plaintiffs' original Complaint referred only to AWPs, and now Plaintiffs' Amended Complaint focuses solely on WACs. (*See id.* at 3-4, 22-23.) To this end, Defendants seem to allege that the Court's previous decision denying Defendants' first Motion to Dismiss as to various state law

---

[9] In their Amended Complaint, Plaintiffs also alleged New Jersey Common Law Fraud against Bayer, before claims against Bayer were dismissed. (Am. Compl. ¶¶ 408-29; Settlement Notice.)

claims should not apply to Plaintiffs' state law claims in the Amended Complaint. (*Id.* at 3-4, 22-27.)

While Plaintiffs stated in their original Complaint that "list price" refers collectively to both AWP and WAC (Compl. ¶ 26[10]), the Court acknowledges that the Court's previous Opinion focused on AWPs and used the term list price interchangeably with only AWPs. (*See* Op. 8, n.6.) The Court finds, however, that Plaintiffs' allegations are sufficient to support that the Court's analysis and findings in its previous Opinion would not be materially different for WACs. On the issue, Plaintiffs allege that "whether coined WAC, AWP, or Reference Prices, [the] advertised price is artificially inflated because they appreciably exceed where a substantial number of sales in the trade area occurred for Test Strips." (Pls.' Opp'n Br. 12 (citing 16 C.F.R. § 233.3).) Plaintiffs further clarify that:

> [d]ue to the nature of Plaintiffs' claims encompassing multiple assignors, some contracts state WAC . . . [and] some state AWP . . . depending on the year and PBM[. I]n either case[,] the term is understood to mean the Reference Price found in certain industry indices. Defendants provide the WAC and/or AWP directly to these industry indices at differing intervals depending on Defendants' pricing actions. In either instance[,] Plaintiffs will establish via evidence that Defendants used these emails to industry indices as actual or pseudo-price advertisements.

(*Id.* at 13 n.5.) In short, Plaintiffs assert that the Court's analysis, whether referring to WACs or AWPs collectively or individually, reaches the same conclusion that Defendants knowingly made material misrepresentations about Test Strip prices by artificially inflating them and providing increasing rebates, thereby "profit[ting] from increased [list prices]" (*Id.* at 11.) At the motion to dismiss stage, construing all allegations in the light most favorable to Plaintiffs, the Court agrees with Plaintiffs that its previous findings still apply.

---

[10] In this specific paragraph, Plaintiffs interchangeably use the term "Wholesale Acquisition Price" in lieu of "Wholesale Acquisition Cost." (Compl. ¶ 26.)

Defendants also argue that Plaintiffs' new claim of concealment or lack of disclosure fails. (Defs.' Moving Br. 14-15, 40-42.) Defendants contend Plaintiffs' allegations hone in on the fact that "Assignors do not know how much *every other health insurer and TPP in the country* received in rebates for test strips" or that Defendants "deceived Assignors by failing to disclose [the] full extent of rebates." (*Id.* at 15 (alteration in original) (quoting Am. Compl. ¶ 87) (citing Am. Compl. ¶ 148).) In their Opposition Brief, Plaintiffs clarify that they "do not make a claim for fraudulent concealment" or omissions, but rather make allegations concerning Defendants' "affirmative fraudulent misrepresentations." (Pls.' Opp'n Br. 28.) Therefore, to the extent Defendants set forth arguments about fraudulent concealment and omissions, the Court declines to address them. (*See* Defs.' Moving Br. 40-42.) This Court clarified in its previous Opinion that "[t]his is not . . . a case involving a failure to disclose information. Rather, Plaintiffs allege that Defendants affirmatively mispresented their [list prices] as benchmark prices when they were not." (Op. 29.)

In the same vein, Defendants' argument that Plaintiffs improperly allege that "Defendants' prices are too high" is unpersuasive. (*See* Defs.' Moving Br. 30.) For the same reasons set forth in the Court's prior Opinion, Plaintiffs' main contention is that Defendants fraudulently misrepresented the list prices of Test Strips because the list prices "so far exceeds the highest price at which substantial sales are made as to violate federal mandate." (Am. Compl. ¶ 15; Pls.' Opp'n Br. 18; *see also* Op. 25 n.14.) Accordingly, Defendants' Motion to Dismiss Plaintiffs' claims for failure to plead a viable theory of liability is denied.

**B.    Article III Standing**

*i.    Series Subsidiaries Assignees*

Defendants assert that claims that are assigned to "Series" subsidiaries cannot be pursued by MSPRC because it is black-letter law that "parent corporations lack standing to sue on behalf of their subsidiaries." (Defs.' Moving Br. 49-50 (quoting *MSP Recovery Claims, Series LLC v.*

*USAA Gen. Indem. Co.*, No. 18-21626, 2018 WL 5112998, at *12 (S.D. Fla. Oct. 19, 2018).) Defendants also, however, acknowledge that federal courts are split as to whether MSPRC has standing to pursue claims assigned to one of its designated series entities.[11] (*Id.*) Defendants argue further that MSPRC lacks standing because it relies on Plaintiffs' corporate documents alone in bringing its claims. (*Id.* at 50-51) Plaintiffs dispute this assertion and cite Delaware law[12] and MSPRC's Operating Agreement to underscore that MSPRC, the parent entity and a Delaware Series LLC, may bring suit on behalf of any numbered series. (Pls.' Opp'n Br. 34-38.) The Court agrees with Plaintiffs.

Under Delaware law, "[a] limited liability company agreement may establish or provide for the establishment of one or more designated series of members, managers, limited liability company interests or assets." DEL. CODE ANN. tit. 6, § 18-215(a) (2003). The statute states that "[u]nless otherwise provided in a limited liability company agreement, a protected series shall

---

[11] The parties do not cite any cases from the Third Circuit on the issue. Indeed, federal courts are split as to whether MSPRC has standing to bring suit on behalf of its series. *MSP Recovery Claims, Series LLC v. Hartford Fin. Servs. Grp., Inc.*, No. 20-305, 2022 WL 3585782, at *5 (D. Conn. Aug. 22, 2022), *appeal withdrawn*, No. 22-2082, 2023 WL 6618115 (2d Cir. Jan. 9, 2023) (listing cases to demonstrate that "a growing number of courts have agreed with [MSPRC's] position that both Delaware law and the Operating Agreement allow it to maintain an action on behalf of its series"); *MSP Recovery Claims, Series LLC v. ACE Am. Ins. Co.*, 974 F.3d 1305, 1320 (11th Cir. 2020) (finding that the organizing LLC has the right to sue on behalf of its series because the Delaware statute states "series *may* have"—and thus are not required to have—"separate rights, powers or duties" from the organizing LLC, and thus the organizing LLC may have the same rights as its series LLC); *but see MSP Recovery Claims, Series LLC v. N.Y. Cent. Mut. Fire Ins. Co.*, No. 19-211, 2019 WL 4222654, at *6 (N.D.N.Y. Sept. 5, 2019) (finding MSPRC's attempt to assert standing on behalf of its series to be "an abuse of corporate form"); *USAA Gen. Indem. Co.*, 2018 WL 5112998, at *12 (stating that MSPRC cannot sue on behalf of its series because "parent corporations lack standing to sue on behalf of their subsidiaries[,]" which is similar to a "series" entity). In considering cases to assess standing, however, Plaintiffs state that the Court should not consider *New York Central Mutual Fire Insurance Company*, 2019 WL 4222654, or *USAA General Indemnity Company*, 2018 WL 5112998, because the cases did not consider MSPRC's Operating Agreement or have since been overruled by *ACE Am. Ins. Co.*, 974 F.3d at 1305.

[12] Both parties seemingly acknowledge that Delaware law applies here because Plaintiff MSPRC is a Delaware limited liability company. (*See* Defs.' Moving Br. 50; Am. Compl. ¶ 26.)

have the power and capacity to . . . sue and be sued." *Id.* § 18-215(b)(1). Relevant here, MSPRC's Amended and Restated Limited Liability Company Operating Agreement (the "Operating Agreement") states that MSPRC "is authorized to pursue or assert any claim or suit capable of being asserted by any designated Series arising from, or by virtue of, an assignment to a designated Series." (Operating Agreement, Pls.' Opp'n Br. Ex. D § 2.3, ECF No. 181-2.) The Operating Agreement also states:

> [MSPRC] will own and control any and all Series as provided for in this Agreement. Accordingly, (i) *[MSPRC] will maintain the legal right to sue on behalf of each Series and be entitled to pursue any and all rights, benefits, and causes of action arising from assignments to a Series*, and (ii) [MSPRC] may in its own name, or in the name of the Series, seek reimbursement of Medicare payments made by assignors. *Any claim or suit capable of being asserted or brought by a Series may be brought by [MSPRC] in its own name or it may elect to bring suit in the name of the designated Series.*"

(*Id.* § 3.1(d) (emphasis added).) In short, the Operating Agreement does not restrict MSPRC's standing to sue on behalf of any of its numbered series; instead, the Operating Agreement explicitly allows MSPRC to bring claims on behalf of them. (*Id.*)

Accordingly, the Court finds that MSPRC has standing to bring claims on behalf of its series.

   ii.  *Alleged Non-Party Assignees*

Next, Defendants argue that Plaintiffs lack Article III standing for AvMed, HEAL, and HFHP because "non-party corporate entities," not MSPRC or MSPA, "are the actual assignees of the Assignors' claims." (Defs.' Moving Br. 4, 45-48.) Plaintiffs counter that the assignments are proper based on the relevant documents produced. (Pls.' Opp'n Br. 33-34.) The Court briefly considers the relevant assignments.

Defendants state that on April 13, 2022, AvMed assigned its claims to Series 21-12-1645, a designated series of MSP Recovery Claims Series COM, LLC, a non-party. (Defs.' Moving Br. at 47.) In response, Plaintiffs duly allege that an August 16, 2019 assignment subsequently assigned AvMed's claims to Series 17-03-615, a designated series of MSPRC and a plaintiff in this action. (Pls.' Opp'n Br. 33 (citing Pls.' Opp'n Br., Ex. A, ECF No. 181-2).)

Next, Defendants state that HEAL and HFHP assigned their claims to various designated series that are non-parties to this action. (Defs.' Moving Br. 47-48.) In response, Plaintiffs indicate that on April 10, 2019, HEAL's claims were assigned to MSPRC, and on August 21, 2019, HFHP's claims were assigned to MSPRC. (Pls.' Opp'n Br. 33-34.) Plaintiffs then explain that these two assignments were subsequently transferred to MSP Recovery Claims Series 44, LLC ("Series 44"), and then transferred *back* to MSPRC, a Plaintiff in this action, on May 31, 2023. (*Id.* at 34 (citing Pls.' Opp'n Br., Exs. B, C, ECF No. 181-2).)

The Supreme Court has upheld "Article III standing of assignees—that is, where a party's right to sue has been legally or contractually assigned to another party." *Thole v. U. S. Bank N.A*, 140 S. Ct. 1615, 1620 (2020) (stating that, for an assignee to have Article III standing, the assignee must have "been legally or contractually appointed to represent the plan."). Here, neither party has disputed the validity of the above assignments. *See Rodin Properties-Shore Mall, N.V. v. Cushman & Wakefield of Pa., Inc.*, 49 F. Supp. 2d 709, 724 (D.N.J. 1999) ("An assignment is a type of contract and therefore its validity is governed—at least in part—by the law of contracts."). In fact, Defendants allege that select assignments, such as the assignment of AvMed's claims, clearly assign claims to a designated series of Plaintiffs, not Plaintiffs themselves. (Defs.' Moving Br. 46-47; *see also* Defs.' Reply Br. 22.) Given that Defendants do not challenge the assignments, and

that the Court previously found that Plaintiffs' standing allegations are sufficient at this stage, the Court rejects Defendants' Article III standing argument as to non-party assignees.[13]

      *iii.*      *MSPA Claims 1, LLC as an Assignee*

Finally, Defendants allege that the assignment agreement between Interamerican Medical Center Group, LLC ("Interamerican Medical Center") and MSPA "is so badly flawed that it cannot confer standing on MSP." (Defs.' Moving Br. 52.)

Defendants attach two assignment agreements for Interamerican Medical Center's claims to their Motion to Dismiss. (*See* Dec. 16, 2014 Assignment, Defs.' Moving Br., Ex. 8a, ECF No. 179; Feb. 20, 2015 Assignment, Defs.' Moving Br., Ex. 8b, ECF No. 179.[14]) Defendants point to the fact that the December 16, 2014 agreement—which assigned claims to non-party MSP Recovery, LLC—has "IMC" handwritten in place of Interamerican Medical Center. (Defs.' Moving Br. 52.) Defendants further note that the subsequent agreement on February 20, 2015— which reassigned the claims from MSP Recovery, LLP to MSPA—also only vaguely refers to "IMC, LLC." (*Id.*; *see also* Dec. 16, 2014 Assignment; Feb. 20, 2015 Assignment.) Defendants assert that even if the December 16, 2014 agreement is a valid contract, the February 20, 2015 reassignment is invalid because Interamerican Medical Center did not approve it in writing as required by the December 16, 2014 agreement. (Defs.' Moving Br. 52-53; Defs.' Reply Br. 25-26.)

---

[13] Moreover, the Court did not direct a party to substitute or join the action pursuant to any interest transfers that occurred after this action was initiated in 2019. *See* FED. R. CIV. P. 25(c) ("In a case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party."). MSPRC was properly named as a plaintiff at the time this action was filed (*See* Compl.; Pls.' Opp'n Br. 34), and thus the Court finds that MSPRC is the proper plaintiff to pursue claims assigned by AvMed, HEAL, and HFHP.

[14] Both assignment agreements are governed by Florida law. (Dec. 16, 2014 Assignment 12; Feb. 20, 2015 Assignment 2.)

Notably, the two agreements were not attached to Plaintiffs' Amended Complaint, although they were referred to in the pleading. (*See* Am. Compl. app. ¶ A2.)

"To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint[,] and matters of public record." *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993). To this end, the Third Circuit has held "that a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Id.* In the appendix to their Amended Complaint, Plaintiffs note that Interamerican Medical Center "entered into an assignment with MSP Recovery, LLC," and that MSP Recovery, LLC subsequently "entered into an assignment with [MSPA]," a plaintiff in this case. (Am. Compl. app. ¶ A2.) Based on these assignments, Plaintiffs assert that MSP Recovery, LLC "irrevocably assign[ed]" to MSPA "its right to recover payments as assigned from Interamerican Medical Group, LLC." (*Id.*) More specifically, Plaintiffs indicate that the two assignments were entered into on December 16, 2014 and February 20, 2015, respectively. (*Id.*) Plaintiffs' claims are based on the two assignment agreements, and Plaintiffs do not dispute the authenticity of the two agreements attached by Defendants. It follows, then, that the Court may consider the two assignments attached by Defendants when analyzing Defendants' Motion to Dismiss.

Construing the Complaint in the light most favorable to Plaintiffs, the Court finds that IMC may well refer to Interamerican Medical Center. Moreover, Defendants do not cite any case law to suggest that "IMC" being handwritten is problematic. As such, to the extent Defendants argue that the abbreviation of Interamerican Medical Center to "IMC" invalidates the assignments, the Court disagrees. Accordingly, the Court finds the December 16, 2014 agreement—which has "IMC" handwritten in place of Interamerican Medical Center—valid. (*See* Defs.' Moving Br. 52.)

Next, the Court considers the February 20, 2015 assignment. Defendants direct the Court

to § 1.2 of the December 16, 2014 assignment, which states:

> **§ 1.2 Term**: MSP Recovery may assign this Agreement in whole or in part, but the assignee must be approved by [Interamerican Medical Center] in writing. No provision(s) of this Agreement may be changed and/or, otherwise, altered without the prior written approval [of Interamerican Medical Center]. No assignment of this Agreement shall be effective unless this Provision is complied with unless the assignment is *ministerial* in nature. An assignment that is ministerial in nature is defined as an assignment wherein the majority control in MSP Recovery remains the same and the agreement in whole must be complied with by the assigned.

(Dec. 16, 2014 Assignment § 1.2 (emphasis added).) Defendants argue that Plaintiffs do not allege

any evidence or information tending to show that the assignments were "ministerial" in nature,

and thus prior written approval of Interamerican Medical Center was required for any subsequent

reassignment. (Defs.' Moving Br. 52-53 (citation omitted).)

In contrast, Plaintiffs argue that this Court should find that the assignment is a valid contract

because "[s]everal courts, including the Eleventh Circuit Court of Appeals," have already "dealt

with this issue." (Pls.' Opp'n Br. 40.) Plaintiffs attach the affidavit of Jessica Alcantara ("Alcantara

Affidavit"), a former manager of Interamerican Medical Center from 2010 until 2017 and a

signatory to the December 2014 assignment, to contend that the assignments are valid.[15] (Pls.'

Opp'n Br. 41; Alcantara Affidavit, Pls.' Opp'n Br. Ex. E, ECF No. 181-2.) Plaintiffs also assert

that, in *MSP Recovery Claims, Series LLC v. ACE American Ins. Co.*, 974 F.3d 1305 (11th Cir.

---

[15] The Alcantara Affidavit states that "[t]he IMC Assignment was executed on behalf of IMC and is a binding and irrevocable assignment and encompasses all claims[,]" and notes that "the acronym IMC is generally used interchangeably to refer to Interamerican Medical Center Group[,] LLC." (Alcantara Affidavit ¶ 6.) It further clarifies that "[t]he intent of the parties in executing the IMC Assignment was and always has been to assign the complete rights, title[,] and interest to claims described in the assignment." (*Id.* ¶ 7.) Finally, the Alcantara Affidavit states that "[a]fter execution of the IMC Assignment, IMC was aware of the subsequent assignment from MSP Recovery LLC to [MSPA] on February 20, 2015. No prior written consent was needed to effectuate that subsequent assignment because it was ministerial in nature." (*Id.* ¶ 8.)

2020), the Eleventh Circuit upheld the validity of the same two assignments based on the Alcantara Affidavit, which was also filed in that case. *ACE Am. Ins. Co.*, 974 F.3d at 1318 (finding that MSPA sufficiently pleaded that it received consent from Interamerican Medical Center for its assignments because the record indicated that "[Interamerican Medical Center] had accepted, acknowledged, approved, and consented to MSPRC's assignment to MSPA" and that "an affidavit from a manager of [Interamerican Medical Center] stat[ed] that [Interamerican Medical Center] was aware of the subsequent assignment from [MSPRC] to MSPA." (internal quotations omitted)).

Importantly, the Alcantara Affidavit is not attached to Plaintiffs' Amended Complaint. "As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). As such, the Court cannot consider arguments set forth in Plaintiffs' Opposition Brief—which rely upon statements made in the Alcantara Affidavit—to underscore that written consent was unnecessary because there was mutual consent to enter into the agreement. (Pls.' Opp'n Br. 41-42.) Plaintiffs provide no other evidence, information, or case law in their Amended Complaint to support their assertion that the assignments were "ministerial" in nature and did not require written consent by Interamerican Medical Center.[16]

In sum, there are no other allegations that the Court can construe in Plaintiffs' favor regarding the validity of the February 20, 2015 assignment of Interamerican Medical Center to MSPA. The Court, therefore, dismisses without prejudice Plaintiffs' claims assigned by Interamerican Medical Center Group to MSPA.

---

[16] The Court notes that it is not bound by the Eleventh Circuit ruling which found the same two assignments valid. *Mohsen v. Gonzales*, No. 07-237, 2007 WL 2137933, at *2 (D.N.J. July 18, 2007) ("[A] decision of another circuit is not binding in this court. . . . A Third Circuit federal district court is bound only by the pronouncements of the Third Circuit Court of Appeals." (citing *UTI Corp. v. Fireman's Fund Ins. Co.*, 896 F. Supp. 362, 379 (D.N.J. 1995))).

C.      **Assignment of Claims Under State Law**

Defendants argue that even if the Court were to assume that Plaintiffs are the proper assignees, "such assignments are invalid under several relevant states' laws that . . . prohibit the assignment of tort claims[.]" (Defs.' Moving Br. 4.) Specifically, Defendants allege that assignment of tort claims arising under state laws are prohibited in Arkansas, Florida, Michigan, New Jersey, Pennsylvania, South Carolina, Tennessee, and Virginia, and thus such state law claims must be dismissed. (*Id.* at 53-57.)

Regarding whether assignments are permitted under state laws, the Court largely adopts its previous Opinion. (*See generally* Op.) In that Opinion, the Court declined to dismiss Plaintiffs' state law claims[17] based on the question of proper assignment because: (1) "whether assignment is permitted under state law involves important policy concerns as they relate to each specific state[,]" and (2) the parties' briefing on the issue of assignment was inadequate. (*Id.* at 21-22.) Although the parties have indeed provided supplemental arguments regarding the issue of assignment, the Court is still in no position to make decisions involving important issues of state public policy where the respective states have not yet done so. *See, e.g., Church Creek Constr., LLC v. Mt. Hawley Ins. Co.*, No. 17-1339, 2019 WL 689545, at *4 (D.S.C. Feb. 19, 2019) ("It appears that South Carolina courts have not confronted the issue of whether a [South Carolina Unfair Trade Practices Act] claim may be brought by an assignee."). The Court, accordingly, declines to dismiss Plaintiffs' state law claims on the basis that Plaintiffs' alleged assignments were not proper under certain states' laws.

---

[17] The Court's previous Opinion involved state law claims under Arizona, Arkansas, Connecticut, Delaware, Michigan, Nevada, New Mexico, Pennsylvania, South Carolina, Tennessee, Virginia, and West Virginia. (Op. 21-22.)

The Court does, however, address whether Plaintiffs' New Jersey assignments were valid in analyzing Plaintiffs' New Jersey common law fraud claim against Johnson & Johnson (Count II).[18] (*See* Am. Compl. ¶¶ 408-29.) In New Jersey, common law fraud is a tort. *D'Angelo v. Miller Yacht Sales*, 619 A.2d 689, 690 (N.J. Super. Ct. App. Div. 1993). "New Jersey courts have consistently held that, as a public policy matter, tort claims cannot be assigned before judgment." *Integrated Sols., Inc. v. Serv. Support Specialties, Inc.*, 124 F.3d 487, 490 (3d Cir. 1997) (collecting cases); *see also Kimball Int'l, Inc. v. Northfield Metal Prod.*, 760 A.2d 794, 802 (N.J. Super. Ct. App. Div. 2000) ("Except for this prohibition against the assignment of tort claims, a party is generally allowed to assign a claim for money damages[,]" such as those "arising on contracts" (citing N.J.S.A. 2A:25–1)). As Defendants note, "[t]here is no prior judgment [alleged] here." (Defs.' Moving Br. 55.) Plaintiffs concede that there has not been a prior judgment in this matter, but argue that the underlying public policy to prevent tort claims from being assigned before a final judgment supports Plaintiffs' argument because "[t]he essential purpose of this prohibition is 'to prevent unscrupulous strangers to an occurrence from preying on the deprived circumstances of an injured person.'" (Pls.' Opp'n Br. 46-47 (citing *Kimball Int'l, Inc.*, 760 A.2d at 802).)

This Court declines to make an exception for Plaintiffs' New Jersey common law fraud claim based on this Plaintiffs' reasoning. New Jersey courts have consistently reaffirmed that a tort claim cannot be assigned prior to judgment. *Ridgewood v. Shell Oil Co.*, 673 A.2d 300, 307 (N.J. Super. Ct. App. Div. 1996) (collecting cases). Accordingly, because no judgment has been entered in this case, Plaintiffs cannot be assigned the common law fraud tort claim under New Jersey law. Likewise, Plaintiffs' attempt to be assigned a right to obtain a future judgment is a

---

[18] This claim was previously withdrawn by Plaintiffs in their opposition brief to Defendants' first Motion to Dismiss, and thus the Court did not address Defendants' arguments related to the count. (Op. 2.)

nullity. *See id.* Plaintiffs' New Jersey common law fraud claim is therefore dismissed without prejudice.

### D.      Champerty Law

Defendants also assert that champerty law[19] prohibits Plaintiffs' state law claims in Delaware, Florida, Indiana, Ohio, and Pennsylvania. (Defs.' Moving Br. 57-60.) Without specific citations to the record, Defendants assert that Plaintiffs receive a "50% 'stake' in the net proceeds" of the Assignors' claims pursuant to relevant assignments, and that Plaintiffs "agreed to pay in advance any litigation expenses associated with enforcing the Assignors' rights." (*Id.* at 58, 60.)

As the parties are aware, this Court's previous Opinion held that "dismissal of Plaintiffs' claims under the laws of champerty is premature." (Op. 23-24.) The Court clarified that although "courts have addressed champertous intent at the motion to dismiss stage in Ohio, Delaware, and Pennsylvania[,]" dismissal of Plaintiffs' claims under champerty laws is improper because there

---

[19] "At its core, 'the champerty doctrine invalidates an assignment of claims where, *inter alia*, the assignee has no interest in the suit *but for* the assignment." (Op. 22 (quoting *Riffin v. Consol. Rail Corp.*, 363 F. Supp. 3d 569, 575-76 (E.D. Pa. 2019)).)

are "no facts presented that demonstrate that Plaintiffs would 'receive a stake' in the Assignors['] claim[s,] and Plaintiffs have, at least, alleged a bona fide and legal interest in the case[.]"[20] (*Id.*)

To this point, in *MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC*, this Court found that plaintiffs had alleged a bona fide interest in the case which allowed their complaint to survive the motion to dismiss stage as it pertained to champerty laws under Ohio, Delaware, and Florida; specifically, the Court noted that "[plaintiffs] contracted to disperse the proceeds to their assignors." *See* No. 18-2211, 2019 WL 1418129, at *9 (D.N.J. Mar. 29, 2019) (citing *Sprint*

---

[20] This Court stated:

> Under Ohio law, "[c]hamperty is 'a form of maintenance in which a nonparty undertakes to further another's interest in a suit in exchange for a part of the litigated matter if a favorable result ensures.'" [*Hiles v. NovaStar Mortg., Inc.*, No. 12-392, 2012 WL 4813775, at *4 (S.D. Ohio Oct. 10, 2012)] (quoting *Rancman v. Interim Settlement Funding Corp.*, 789 N.E.2d 217, 219 (Ohio 2003)). "Importantly, to bar a suit on the grounds of champerty under Ohio law, a court must be persuaded that the assignee either has 'no bona fide interest in the case' or would 'receive a stake in the assignors' claims." [*MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC*, No. 18-2211, 2019 WL 1418129, at *9 (D.N.J. Mar. 29, 2019)] (citing *Hiles*, 2012 WL 4813775, at *4). Similarly, under Delaware law, "[t]he doctrines of champerty and maintenance apply only to 'volunteers' or 'strangers'—those who have no legal interest in the subject matter of the dispute; those who have no relation to either of the parties to the dispute; and those who are not acting in the lawful exercise of their profession as counsel to one of the parties." *Hall v. Delaware*, 655 A.2d 827, 829 (Del. Super. Ct. 1994). Moreover, "Pennsylvania's champerty doctrine invalidates an assignment of claims 'when the party involved: (1) has no legitimate interest in the suit, but for the agreement; (2) expends his own money in prosecuting the suit; and (3) is entitled by the bargain to share in the proceeds of that suit." [*Riffin v. Consol. Rail Corp.*, 363 F. Supp. 3d 569, 576 (E.D. Pa. 2019)]. The case law makes clear that to evaluate champertous intent, specific facts matter.

(Op. 23. (first and fourth alteration in original).)

*Comms. Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 287 (2008)). The Court also considered that "[p]laintiffs noted they were assigned the claims due in part to the assignors' difficulty in identifying potential causes of action." *Id.* Similarly, here, Plaintiffs assert that the assignment agreements grant Plaintiffs a "legally cognizable interest in the recovery rights" assigned by each of the Assignors, and that the Plaintiffs "brought suit to enforce claims for their assignors because of Assignors' difficulty in identifying these claims." (*See* Pls.' Opp'n Br. 55, 59.)

Following this Court's prior ruling, this Court finds that Defendants have not met their burden to dismiss Plaintiffs' claims under champerty law, and that "a [dismissal] of Plaintiffs' claims pursuant to the doctrine of champerty at this point in the litigation would be premature." *Sanofi Aventis*, 2019 WL 1418129, at *9.

### E.     Common Law Fraud Claims (Counts II-V)

Plaintiffs allege common law fraud claims under: (1) Indiana law against Roche (Count III);[21] (2) Illinois law against Abbott (Count IV); and (3) Pennsylvania law against LifeScan (Count V).[22] (Am. Compl. ¶¶ 430-500.) Plaintiffs assert that Defendants made affirmative fraudulent misrepresentations despite their duty not to publish false list prices. (*Id.* ¶¶ 42, 88, 431, 442-43, 455, 465-66, 478, 489-90.) In response, Defendants argue that Plaintiffs fail to: (1) satisfy the Rule 9(b) particularity requirement for multiple elements; (2) "plausibly allege justifiable

---

[21] Plaintiffs previously withdrew their common law fraud claim against Roche under Indiana law in their opposition brief to Defendants' first Motion to Dismiss, and thus the Court did not address Defendants' arguments related to this claim. (Op. 2.)

[22] Having dismissed Plaintiffs' New Jersey common law fraud claim against Johnson & Johnson (Count II) due to improper assignment, *supra* pp. 23-24, the Court assesses Defendants' Motion to Dismiss regarding Plaintiffs' common law fraud claims under Indiana, Illinois, and Pennsylvania law.

reliance"; and (3) "allege any plausible damages resulting from the alleged fraud." (Defs.' Moving Br. 14, 35-40.)

To state a claim of common law fraud under Illinois, Indiana, and Pennsylvania law, a plaintiff must allege "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." (*See* Op. 24 (citing *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 591 (Ill. 1996) (analyzing Illinois and Pennsylvania Supreme Court precedent))); *see also Kornea v. J.S.D. Mgmt., Inc.*, 366 F. Supp. 3d 660, 672 (E.D. Pa. 2019); *Laws. Title Ins. Corp. v. Pokraka*, 595 N.E.2d 244, 249 (Ind. 1992)[23].

In its previous Opinion, this Court found that Plaintiffs sufficiently pleaded common law fraud claims under Illinois and Pennsylvania law against Abbott and LifeScan, respectively. (Op. 24-33.) In short, the Court considered Plaintiffs' allegations made in their Complaint in support of the common law fraud claims—allegations that are effectively the same as those made in Plaintiffs' Amended Complaint (*compare id.* at 25-26 (citing *Compl.* ¶¶ 616, 639) *with* Am. Compl. ¶¶ 409, 431, 455, 478)—and held that the "allegations are sufficient to support Plaintiff[s'] theory that the list prices for Defendants' products are fraudulent misrepresentations." (Op. 26.) Specifically, the Court found Plaintiffs' allegations that:

---

[23] The Court notes that in Indiana, a plaintiff alleging a claim of fraud must prove:

> (1) a *material misrepresentation* of past or existing fact which (2) was untrue, (3) was made with knowledge of or *in reckless ignorance* of its falsity, (4) was made with the intent to deceive, (5) was rightfully relied upon by the complaining party, and (6) which proximately caused the injury or damage complained of.

*See Laws. Title Ins. Corp.*, 595 N.E.2d at 249 (emphasis added) (citations omitted). The Court's analysis does not change whether Plaintiffs allege that Defendants made a false statement or a material misrepresentation, or whether Defendants made the misrepresentation with knowledge or in reckless ignorance.

> Defendants knowingly made material misrepresentations to the general public by stating that the [T]est [S]trip AWPs, which Plaintiffs alleged were artificially inflated to cover the costs of the rebates paid to PBMs, served as a reasonable reimbursement benchmark and that the AWPs were a fair basis on which to base payments from third-party payors.

(*Id.*)

The Court finds that Defendants' arguments in their Motion to Dismiss have already been carefully considered. (*See* Op. 25-29; *id.* at 32-33 (finding Plaintiffs' "allegations are sufficient to plead reliance"); *id.* at 33 (holding Plaintiffs' allegations are sufficient to plead "damages stemming from their reliance, namely that the Defendants' conduct caused Plaintiffs' Assignors to make 'inflated payments for the [p]roducts in reliance on the falsely inflated list prices.'" (citing Compl. ¶ 181)).) Given that the Court has thoroughly addressed Plaintiffs' common law fraud claims in its previous Opinion and has already established that the analysis would not be materially different for list prices including WAC, the Court adopts its previous findings and conclusions.[24] (Op. 24-33.) Accordingly, Defendants' Motion to Dismiss Plaintiffs' common law fraud claims under Indiana, Illinois, and Pennsylvania law is denied.

### F.    State Consumer Protection Violations (Count I)

Defendants also move to dismiss Plaintiffs' claims under various state consumer protection laws. (*See* Defs.' Moving Br. 21-33.) Plaintiffs assert that Defendants have engaged in "unfair, false, unconscionable, or deceptive acts or practices with respect to the pricing of their [p]roducts, in violation of [twenty-one] state consumer protection statutes," despite having a duty not to do so. (Am. Compl. ¶¶ 167-69.) In response, Defendants assert three arguments that are similar to

---

[24] In a cursory fashion, Defendants cite one case decided by the Third Circuit after this Court issued its previous Opinion to support their argument that Plaintiffs have not sufficiently stated a viable claim. (Defs.' Moving Br. 37 (citing *Thompson v. Se. Pa. Transp. Auth.*, No. 21-2286, 2022 WL 17958629, at *4 (3d Cir. Dec. 27, 2022)).) Defendants, however, do not provide a meaningful explanation for why this case in particular supports their argument.

those asserted in their initial Motion to Dismiss—that Plaintiffs do not adequately allege: (1) misrepresentation; (2) omission; or (3) other misconduct for their consumer protection claims. (Defs.' Moving Br. 21-33.) Defendants, accordingly, argue that all state consumer protection claims must be dismissed. (*Id.*)

As previously discussed, the Court finds that Plaintiffs have sufficiently pled fraudulent misrepresentation regarding the accuracy of Defendants' published list prices.[25] Moreover, Plaintiffs clarify that they do not assert a fraudulent concealment or omissions theory. *See supra* p. 14. Defendants' first two arguments, therefore, are null.

Additionally, with the exception of Plaintiffs' claim under the New York General Business Law ("NYGBL"), Defendants did not provide detailed reasons as to why this Court should individually dismiss each of Plaintiffs' state consumer protection claims. (*See generally* Defs.' Moving Br. 21-33.) In its previous Opinion, the Court declined to conduct an independent review of the merits of each state consumer protection claim because Defendants "[did] not set forth detailed reasons [as to why] . . . dismissal is warranted for the majority of Plaintiffs'

---

[25] Defendants also argue that Plaintiffs make allegations as to multiple defendants without specifying which allegations of fraud apply to which defendant, as required when pleading fraud against multiple defendants. (Defs.' Moving Br. 25; Defs.' Reply. 12.) Indeed, "[w]hen multiple defendants are involved, the complaint must plead with particularity by specifying the allegations of fraud applying to each defendant." *MDNet, Inc. v. Pharmacia Corp.*, 147 F. App'x 239, 245 (3d Cir. 2005) (citation omitted); *see also MSP Recovery Claims, Series LLC v. Mallinckrodt ARD Inc.*, No. 18 C 00379, 2019 WL 11658793, at *1 n.4 (N.D. Ill. Jan. 25, 2019) ("'[G]roup pleading'—where a plaintiff's allegations simply lump defendants together without describing which defendant is responsible for what conduct or when each defendant participated in that unspecified conduct—is insufficient at the motion-to-dismiss stage."). Here, Plaintiffs' Amended Complaint identifies which individual Defendants they accuse of fraud. (*See generally* Am. Compl. ¶¶ 117-23.) Indeed, Plaintiffs specifically indicate which individual Defendant and when each individual Defendant admitted to the alleged scheme of publishing artificially inflated list prices. (*See id.* ¶ 117 (J&J); *id.* ¶ 119 (Abbott); *id.* ¶¶ 118, 120-23 (Roche).) The Court, therefore, declines to dismiss Plaintiffs' fraudulent misrepresentation claims on the basis of improper group pleading.

state[-]specific consumer protection claims." (Op. 33.) Likewise, the Court adopts its previous findings and does not "act as [an] advocate and determine, *sua sponte*, whether Plaintiffs have, in fact, alleged every element of each state's consumer protection law." (*Id. at* 34.) The Court, therefore, rejects Defendants' basis for dismissal at this stage and finds that Plaintiffs have sufficiently alleged consumer protection claims under the laws of Arkansas, Connecticut, Delaware, Florida, Idaho, Indiana, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Mexico, North Dakota, Ohio, Pennsylvania, South Carolina, Tennessee, and Virginia.

The Court, however, considers Plaintiffs' NYGBL claim. In its previous Opinion, the Court dismissed Plaintiffs' claim under the NYGBL without prejudice because Plaintiffs did not sufficiently allege that the supposed misleading conduct "was consumer-oriented," as required by NYGBL Section 349. (Op. 36-37 (quoting *WorldHomeCenter.com,Inc. v. PLC Lighting, Inc.*, 851 F. Supp. 2d 494, 498 (S.D.N.Y. 2011))); N.Y. GEN. BUS. LAW § 349 (McKinney 2014)). The Court specified that the "requirement 'may be satisfied by showing that the conduct at issue potentially affects similarly situated consumers' and has 'a broad impact on consumers at large.'" (Op. 36 (quoting *WorldHomeCenter.com*, 851 F. Supp. 2d at 498).) Ultimately, the Court found that Plaintiffs failed to satisfy this requirement because Plaintiffs did not show that the claim was "consumer-oriented" or had a direct impact on consumers. (*Id.* at 37.) Plaintiffs now reallege their NYGBL claim, adding that individual consumers were "directly harmed" because Defendants published "fraudulently inflated list prices for the general public to view and base their purchasing decisions on." (Am. Compl. ¶ 165.) Plaintiffs further allege that Defendants have thus "directly harmed all consumers who rely on list prices published by manufacturers for the manufacturers' products." (*Id.*)

This Court has held that "[a]n injury is not consumer oriented if it involves "business-to-business transactions[,]" including transactions "involving complex arrangements, knowledgeable and experienced parties and large sums of money." *Sanofi-Aventis*, 2020 WL 831578, at *10 (quoting *ExxonMobil Inter-America v. Advanced Info. Eng'g Servs.*, 328 F. Supp. 2d 443, 448 (S.D.N.Y. 2004)) (finding that transactions were "not consumer oriented" because each party was a "sophisticated business"—"[p]laintiffs [were] three limited liability corporations and defendants [were] one limited liability corporation and two corporations."). Here, the parties are sophisticated businesses—Plaintiffs are two limited liability corporations and Defendants are six corporations. (Am. Compl. ¶¶ 26-38.)

Plaintiffs, nevertheless, allege that courts have allowed sophisticated businesses to bring cases against other sophisticated businesses under the NYGBL. (Pls.' Opp'n Br. 19-20.) These cases, however, involved allegations of direct injuries, not remote or derivative injuries. *See Johnson & Johnson Health Care Sys. Inc. v. Save On SP, LLC*, No. 22-2632, 2023 WL 415092, at *6 (D.N.J. Jan. 25, 2023) (finding that plaintiff alleged a direct injury because "[the] alleged injury is not a consumer's injury that is then passed on to [p]laintiff."). Moreover, Plaintiffs are assignees of TPPs (Am. Compl. ¶ 4), and the New York Court of Appeals has held that a TPP "has no standing to bring an action under [NYGBL] § 349 because its claims are too remote." *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*, 818 N.E. 2d 1140, 1140 n.3 (N.Y. 2004) (stating that the court's holding is in accordance with the holdings of other New York cases— which found that "plaintiffs' claims for deceptive trade practices were too remote to allow recovery because they were derivative of the harm to their patients/members"—as well as the holdings of several other courts).

Accordingly, Plaintiffs' claim under the NYGBL is dismissed with prejudice.

### G.     Unjust Enrichment (Count VI)

Finally, Plaintiffs bring claims for unjust enrichment under Illinois and Pennsylvania law. (Am. Compl. ¶¶ 501-17.) The Court previously denied Defendants' Motion to Dismiss Plaintiffs' unjust enrichment claims under Illinois and Pennsylvania law. (Op. 44.) Contrary to Defendants' arguments that Defendants did not confer a benefit to the detriment of Plaintiffs, the Court found that Plaintiffs sufficiently alleged that Defendants benefited from increased profits and market share at Plaintiffs' expense due to inflated prices paid by its Assignors. (*Id.*)

Defendants now assert a different theory. Defendants argue that Plaintiffs admit their Assignors "*contract* with and pay PBMs" to negotiate rebates, and thus any equitable claim for unjust enrichment is improper because the claims are governed by contracts. (Defs.' Moving Br. 4; 42-45.) Defendants again assert that Plaintiffs have "not identified any benefit unjustly conferred on Defendants *by the Assignors*[,]" a requirement in both Illinois and Pennsylvania. (*Id.* at 4.) The Court addresses each argument in turn.

As an initial matter, and as outlined in the Court's previous Opinion, to state a claim of unjust enrichment under Illinois law, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." (Op. 44 (citing *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011)).) Likewise, "under Pennsylvania law, '[u]njust enrichment is . . . an equitable doctrine,'" which requires that a plaintiff show "benefits conferred on one party by another, appreciation of such benefits by the recipient, and acceptance and retention of these benefits under such circumstances that it would be inequitable [or unjust] for the recipient to retain the benefits without payment of value." (*Id.* (citing *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 447 (3d Cir. 2000)).)

i.      *Existence of a Contract*

Indeed, in Pennsylvania and Illinois, a claim for unjust enrichment is improper when the claim involves a relevant contract. *Vantage Learning (USA), LLC v. Edgenuity, Inc.*, 246 F. Supp. 3d 1097, 1100 (E.D. Pa. 2017) ("[T]he existence of a contract prevents a party from bringing a claim for unjust enrichment."); *Gagnon v. Schickel*, 983 N.E.2d 1044, 1052 (Ill. App. Ct. 2012) ("[A]lthough a plaintiff may plead claims alternatively based on express contract and an unjust enrichment, the unjust enrichment claim cannot include allegations of an express contract." (citation omitted)).

Rule 8(d)(2), however, permits a plaintiff to plead unjust enrichment in the alternative in certain circumstances, "even where the existence of a contract would preclude recovery for unjust enrichment." *Vantage Learning (USA), LLC*, 246 F. Supp. 3d at 1100 (citing Rule 8(d)(2) ("[A] party may set out [two] or more statements of a claim or defense alternatively or hypothetically")); *see also In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 544 (D.N.J. 2004) (finding it premature to dismiss unjust enrichment claims at the motion to dismiss stage because plaintiffs "are clearly permitted to plead alternative theories of recovery" (citing *United States v. Kensington Hosp.*, 760 F. Supp. 1120, 1135 (E.D. Pa.1991))). "Such circumstances require either that (i) the contract at issue *covers only a part of the relationship between the parties*, or that (ii) the existence of a contract is uncertain or its validity is disputed by the parties." *Vantage Learning (USA), LLC*, 246 F. Supp. 3d at 1100 (emphasis added); *see also Gagnon*, 983 N.E.2d at 1052 (finding unjust enrichment "is inapplicable where an express contract, oral or written, governs the *parties' relationship*." (emphasis added)).

Here, Defendants point to a contract between Plaintiffs' Assignors and PBMs, and not directly between Plaintiffs' Assignors and Defendants. Because the contract covers only a part of the relationship between the parties, Defendants fail to satisfy their burden in pleading that

Plaintiffs' claim of unjust enrichment is improper. The Court thus declines to dismiss Plaintiffs' unjust enrichment claims on this basis.

        ii.        *Unjust Enrichment Against a Third Party*

Regarding Defendants' allegation that Defendants did not confer any benefit from the Assignors themselves (Defs.' Moving Br. 44-45), the Court adopts its findings from its previous Opinion pertaining to Plaintiffs' unjust enrichment claims under Pennsylvania and Illinois law— namely that the inflated prices paid by the Assignors conferred the benefit of increased profits and market share upon Defendants. (Op. 44-45.) The Court found that a plaintiff need not directly confer a benefit on a defendant to allege unjust enrichment under both Illinois and Pennsylvania law. (*Id.* (quoting *Baker v. Family Credit Counseling Corp.*, 440 F. Supp. 2d 392, 420 (E.D. Pa. 2006); *Cleary*, 656 F.3d at 516).)

Without much analysis to support their argument, Defendants briefly mention that suits against non-parties to a contract are generally prohibited in Pennsylvania "when the subject matter of the dispute is governed by the contract." (Defs.' Moving Br. 43 (citing *Century Indem. Co. v. URS Corp.*, No. 08-5006, 2009 WL 2446990, at *10 (E.D. Pa. Aug. 7, 2009)).) To be certain, even in Illinois, "a party who performs services under a contract cannot sue third parties for unjust enrichment merely because they benefit from that performance[.]" *RBS Citizens, N.A. v. Bentley Motors, Inc.*, No. 10-2929, 2012 WL 1565457, at *3 (N.D. Ill. May 2, 2012) (citing *Goldstick v. ICM Realty*, 788 F.2d 456, 467 (7th Cir.1986)). Under Illinois law, when a party seeks to recover a benefit conferred by a third party, unjust enrichment is proper only if:

> (1) the benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant instead, (2) the defendant procured the benefit from the third party through some type of wrongful conduct, or (3) the plaintiff for some other reason had a better claim to the benefit than the defendant.

*Cement-Lock v. Gas Tech. Inst.*, 618 F. Supp. 2d 856, 886 (N.D. Ill. 2009).

Similarly, under Pennsylvania law, a "[p]laintiff need not have a direct relationship with [the d]efendant in order to state an unjust enrichment claim. *Century Indem. Co.*, 2009 WL 2446990, at *8 (citing *Glob. Ground Support, LLC v. Glazer Enters., Inc.*, 581 F. Supp. 2d 669, 676 (E.D. Pa. 2008)). Instead, "the appropriate inquiry is whether the benefit, if any, that [p]laintiff conferred on [d]efendant was more than remote or incidental." *Id.*

"[W]hether the doctrine of unjust enrichment applies 'depends on the unique factual circumstances of each case.'" *Id.* at *6 (quoting *Styer v. Hugo*, 619 A.2d 347, 350 (Pa. Super. Ct. 1993)). In *In re K-Dur Antitrust Litigation*, for example, the plaintiffs, which included third-party payors such as health insurers, sued defendants, who manufactured a prescription drug. 338 F. Supp. 2d 517, 544 (D.N.J. 2004). Similar to this case, the plaintiffs in *In re K-Dur* stated a claim for unjust enrichment under Pennsylvania law, alleging that defendants "set artificially high prices." *Id.* at 526, 543-46. The court denied defendants' motion to dismiss the unjust enrichment claim, finding that the plaintiffs' purchase of the prescription drug was a benefit conferred on the manufacturer because plaintiffs sought to recover the actual cost of the prescription drug itself. *Id.* at 545 (noting that "a benefit conferred need not mirror the actual loss of the plaintiff." (citing *Durant v. Servicemaster Co.*, 147 F. Supp. 2d 744, 749 (E.D. Mich. 2001))). The court in *In re K-Dur* distinguished the facts of that case from the facts of *Allegheny General Hospital v. Philip Morris, Inc.*, noting that the plaintiffs in *Allegheny* sought to recover indirect costs, such as "outlays made for coverage of [associated] health risks[.]" *Id.* at 545; *Allegheny General Hospital*, 228 F.3d 429, Here, like in *In Re K-Dur*, Plaintiffs seek to recover direct costs—the inflated prices paid by their Assignors—which allegedly unjustly benefited Defendants with increased profits and market share. (*E.g.*, Am. Compl. ¶¶ 164-65.)

Accordingly, the Court reaches the same conclusion as it did in its previous decision and finds that Defendants have not satisfied their burden of showing that no valid unjust enrichment claim has been presented at the pleading stage, and thus Defendants' Motion to Dismiss Plaintiffs' unjust enrichment claims is denied. *See Hedges*, 404 F.3d at 750.

## IV.  CONCLUSION

For the reasons set forth herein, Defendants' Motion to Dismiss is granted in part and denied in part. The Court will enter an Order consistent with this Memorandum Opinion.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE